1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   MICHAEL R. MARCUS, et al.,              Case No. 22-cv-09058-HSG

8                  Plaintiffs,              **ORDER REGARDING THE PARTIES'**
                                            ***DAUBERT* AND DEFENDANTS'**
9         v.                                **SUMMARY JUDGMENT MOTIONS**

10  AIR & LIQUID SYSTEMS                     Re: Dkt. Nos. 353, 356, 357, 360, 362, 367,
    CORPORATION, et al.,                     369, 382, 384, 388, 389, 391, 399, 402, 404,
11                                           409, 413,414, 415, 502, 504
                   Defendants.

12

13          Pending before the Court are the parties' *Daubert* motions to exclude expert witness

14  testimony (Dkt. Nos. 360, 362, 369, 396, 407, and 413), as well as Defendants' motions for

15  summary judgment (Dkt. Nos. 353, 356, 357, 367, 382, 384, 388, 389, 399, 402, 404, 409, 414,

16  415) and partial summary judgment (Dkt. No. 391).  The Court finds these matters appropriate for

17  disposition without oral argument and the matters are deemed submitted.  *See* Civil L.R. 7-1(b).

18  For the reasons discussed below, the Court will **GRANT IN PART and DENY IN PART**

19  Plaintiffs' motion to exclude Christopher Herfel, **DENY** Defendants' motions to exclude,

20  **GRANT** Metalclad Insulation LLC's motion for partial summary judgment, **GRANT IN PART**

21  **and DENY IN PART** the motions for summary judgment and partial summary judgment filed by

22  Cleaver Brooks, Inc., Plant Products & Supply Co., BW/IP, Inc., Foster Wheeler Energy

23  Corporation, Greene, Tweede & Co., Air & Liquid Systems Corporation, Rockwell Automation,

24  Inc, the J.R. Clarkson Company LLC, Velan Valve Corporation, Gardner Denver, Inc., Eaton

25  Corporation, and BWDAC, Inc.,and **DENY** the motions for summary judgment brought by Clark

26  Reliance Corporation, Electrolux Home Products, Inc., Spirax Sarco, Inc., and Warren Pumps,

27  LLC.

28

United States District Court
Northern District of California

## I.   BACKGROUND

Plaintiffs Michael R. Marcus and Victoria L. Marcus initially brought this lawsuit in Alameda Superior Court in November 2022, alleging that Mr. Marcus developed mesothelioma from exposure to asbestos-containing products or equipment while working aboard United States Naval vessels and in Naval shipyards.  *See* Dkt. No. 1-1, Ex. A.  Plaintiffs allege that Defendants either manufactured or supplied the asbestos-containing equipment with which Mr. Marcus worked.  As relevant to these motions, Mr. Marcus served between 1966 and 1986 as a boiler technician and boiler repairman aboard the *USS Kawishiwi* from September 1966 to December 1969; the *USS Trippe* from May 1970 to January 1972; the *USS Hancock* from April 1974 to June 1975; the *USS Bryce Canyon* from June 1975 to August 1978; and the *USS Kitty Hawk* from October 1978 to April 1981.  Dkt. No. 435-2, Ex. A at 14:3-27:22. In addition, while working for the Fleet Maintenance Assistance Group in San Diego, California from April of 1972 through April of 1974, and while posted on the *USS Bryce Canyon*, Mr. Marcus worked on other naval vessels beyond those named above.  *Id.*

## II.   DISCUSSION

### A.   Expert Witness Motions

#### i.   Legal Standard

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if the expert is qualified and if the testimony is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004).  Rule 702 "contemplates a broad conception of expert qualifications."  *Hangarter*, 373 F.3d at 1018 (emphasis in original).

Courts consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *see also* Fed. R. Evid. 702. Relevance, in turn "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted). Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

### ii. Analysis

#### a. Michael Ellenbecker

Defendants Plant Products & Supply Co. ("PPS") filed a motion seeking to disqualify Plaintiff's expert Michael Ellenbecker, an industrial hygienist, from testifying at trial. *See* Dkt. No. 360.[1] The Court will **DENY** the motion.[2]

In its motion, PPS, a supplier of half-round pipe insulation, does not question Ellenbecker's credentials to serve as an expert in industrial hygiene.[3] Rather, it takes issue with

---

[1] The following Defendants filed notices or motions of joinder to Plant Products & Supply Co.'s motion (Dkt. No. 360): BW/IP Inc. (Dkt. No. 375); Foster Wheeler Energy Corporation (Dkt. No. 380); Electrolux Home Products, Clark Reliance Corporation, Spirax Sarco, Flowserve Us Inc., and Rockwell Automation, Inc. (Dkt. No. 394); Cleaver Brooks, Inc., Grinnell LLC, Hill Brothers Chemical Company, and ITT LLC (Dkt. Nos. 421, 442); and The J.R. Clarkson Company LLC (Dkt. No. 412).

[2] Schneider Electric USA Inc. ("Schneider") also filed motions to exclude Plaintiffs' expert Ellenbecker under Federal Rules of Evidence 703 (Dkt. No. 396) and 702 (Dkt. No. 407). Cleaver Brooks, Inc., Grinnell LLC, Hill Brothers Chemical Company filed notices joining these motions. *See* Dkt Nos. 443, 444. However, they did so only *after* Schneider withdrew its motions due to resolving with Plaintiffs. Dkt. Nos. 435, 436. As such, the Court finds that Dkt. No. 396 and 702 are not live motions, and should be denied as moot on that basis alone. But even considering the substance of Schneider's arguments, the Court finds them without merit: Schneider sought to exclude Ellenbecker entirely, lest he provide testimony as to defendant-specific liability that there is no indication that he intends to provide.

[3] Michael Ellenbecker received a Doctor of Science degree from the Harvard University School of Public Health, is certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene, and is now a professor emeritus of Occupational and Environmental

3

*United States District Court*
*Northern District of California*

testimony that he could theoretically offer at trial, but did not provide in his report.  In particular,

PPS argues that "Ellenbecker should be precluded from offering an opinion that Mr. Marcus was

at an increased risk for developing a disease due to exposure from bystander exposure to half-

round pipe insulation supplied by Plant Products when others within his vicinity installed the

product."  Dkt. No. 360 at 4. [4]  To be clear, Ellenbecker never offered any opinions about PPS in

his report; instead, and as relevant here, he opined generally about the levels of asbestos exposure

resulting from the installation of thermal insulation that Mr. Marcus testified to performing. Dkt.

No. 454-7, Ex. F ("Ellenbecker Report") at 27–28.  To support his opinion that "[t]he published

scientific literature documents the very high levels of asbestos exposure caused by the

maintenance activities described by Mr. Marcus," he points to studies performed by various

researchers (Balzer and Cooper, Fontaine and Trayer, and Harries) that evaluated asbestos

exposure during installation and removal of asbestos-containing insulation.  To the extent that PPS

believes that these studies analyzed conditions that are factually distinguishable from those in

which Mr. Marcus worked, PPS may highlight those differences on cross examination.  For

example, PPS contends that the studies upon which Ellenbecker relies do not accurately reflect the

exposures experienced by bystander personnel like Mr. Marcus (as opposed to those personnel

directly involved in installing and removing insulation), and moreover are inapplicable because

they do not account for the supposedly asbestos-free composition of the half-rounds pipe

insulation supplied by PPS.  Nothing precludes PPS from challenging testimony actually provided

by Ellenbecker at trial that unjustifiably analogizes between the literature and Mr. Marcus's

experience, or purports to characterize the asbestos content of PPS's or any defendant's products

in particular.

     In short, vigorously testing Ellenbecker's *actual* testimony, rather than excluding him from

the trial entirely based on the specter of *possible* testimony is the correct course here.  *See*

---

Hygiene at the University of Massachusetts Lowell's Department of Public Health, where he has
taught for 35 years.  *See* Dkt. No. 456-3, Ex. B (Ellenbecker CV).  His resume identifies hundreds
of journal articles, symposia, textbooks, technical reports, and grants that he has been involved in,
many of which bear on asbestos.  *Id.*

[4] For clarity and ease of reference, the Court refers to the page numbers of the PDF rather than the
specific exhibit, unless otherwise stated.

United States District Court
Northern District of California

1    *Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross

2    examination, contrary evidence, and attention to the burden of proof, not exclusion.")  PPS's

3    motion is **DENIED.**

4            b.  Murray Finkelstein

5        Defendant Air & Liquid Systems Corporation ("Air & Liquid") has filed a motion seeking

6    to disqualify Plaintiff's expert Dr. Murray Finkelstein, an epidemiologist, from testifying at trial.

7    Air & Liquid essentially argues that Dr. Finkelstein's testimony advances the impermissible

8    "every exposure" theory, and should therefore be excluded as unreliable.  *See generally* Dkt. No.

9    362-1.[5]  The Court will **DENY** the motion.[6]

10       For context, Dr. Finkelstein is a physician-epidemiologist with decades of experience

11   working in medicine and specifically researching asbestos.  He has held both clinical and

12   academic appointments in medicine, and is currently a professor at McMaster University (in the

13   Program in Occupational Health and Environmental Medicine and Department of Family

14   Medicine) and University of Toronto (in the Faculty of Medicine's Department of Family and

15   Community Medicine and the Dalla Lana School of Public Health).  Dkt. No. 446-3, Ex. B

16   (Finkelstein CV) at 2–3.  He has held various other advisory appointments, including on the

17   United States' Environmental Protection Agency's Science Advisory Board Asbestos Panel.  *Id*. at

18   3.  According to his resume, he has authored nearly 150 peer reviewed articles, dozens of which

19   relate to asbestos and asbestos-related diseases.  *Id*. at 12–23.

20       In his expert report, Dr. Finkelstein first discusses general causation.  "[B]ased upon 44

21   years of research[ing] and study[ing]" the "health effects of exposure to asbestos," Dr. Finkelstein

22   opines that there is "overwhelming, generally accepted evidence that inhalation of asbestos fibers"

23

24   [5] The following Defendants filed notices or motions of joinder to Air & Liquid Systems Inc.'s
     motion: Velan Valve Corporation (Dkt. No. 364); BW/IP, Inc. (Dkt. No. 376); Plant Products &
25   Supply Co. (Dkt. No. 379); Warren Pumps, LLC (Dkt. No. 381); Electrolux Home Products, Clark
     Reliance Corporation, Spirax Sarco, Flowserve US Inc., and Rockwell Automation, Inc. (Dkt. No.
26   395); The J.R. Clarkson Company LLC (Dkt. No. 411); Cleaver Brooks, Inc., Grinnell LLC, Hill
     Brothers Chemical Company, and ITT LLC (Dkt. Nos. 423, 439).
27   [6] The only briefing before the Court is Air & Liquid's motion (Dkt. No. 362), the notices of
     joining Defendants, and Plaintiffs' opposition (Dkt. No. 446.  The Court has not identified any
28   reply filed in support of the motion, and the parties – despite being ordered to do so – also have
     not brought one to the Court's attention.

United States District Court
Northern District of California

causes "mesothelioma (regardless of location), lung cancer and other cancers, asbestosis, and pleural thickening and plaques." Dkt. No. 446-2, Ex. A ("Finkelstein Report") at 19. He does not attribute different degrees of potency to different types of asbestos or fibers. *See id*. at 20. Dr. Finkelstein then goes on to offer opinions as to specific causation in this case. He concludes, "to a reasonable degree of medical certainty, that Mr. Marcus' exposures to asbestos fibers, arising in from his service in the Navy were substantial contributing causes of his malignant pleural mesothelioma." *Id*. at 51. Specifically, he opines that "[e]xposure to each class of product constituted a substantial factor contributing to the risk of mesothelioma," where a "class of products" refers to gaskets, packing, insulation, and friction products. While his report does not apportion responsibility for exposure between individual defendants with products in those classes, it does provide significant analysis of the intensity of asbestos exposure caused by exposure to the "class[es] of products" with which Mr. Marcus testified to working, and the activities he testified to performing on them. Take, for instance, removing and replacing packing – a task Mr. Marcus testified to performing countless times. Based on simulation studies and relevant literature, Dr. Finkelstein concludes that "[t]he exposure from packing removal and replacement is [] 0.025 fiber-hrs/cc / 8760 hours/yr = 0.000003 fiber-years (which is 15% of the annual ambient exposure to asbestos fibers)," such that "[a]sbestos exposure from 7 gasket removal and replacement jobs thus is equivalent to ambient exposure for 1 year." *Id*. at 62. He steps through similar analysis for the other "class[es] of product[s]."

Contrary to Air & Liquid's argument, Dr. Finkelstein's analysis does not rely upon "exactly the same improper conclusions rejected in *McIndoe* [*v. Huntington Ingalls Inc.*, 817 F.3d 1170 (9th Cir. 2016)]." Dkt. No. 362-1 at 11. Just because Dr. Finkelstein did not perform a quantitative dose reconstruction does not mean that his opinion is necessarily deficient, or that it improperly presupposes that all asbestos exposures have interchangeable health effects. In fact, his analysis explicitly takes into account the variation of asbestos exposures, and opines that different tasks carry different asbestos exposure burdens relative to the ambient amount. The Court therefore does not find it unreliable for Dr. Finkelstein to conclude, after considering these burdens alongside Mr. Marcus's testimony about the frequency with which he completed various

United States District Court
Northern District of California

tasks, that exposure to each class of products "constituted a substantial factor."

As mentioned, however, Dr. Finkelstein does not offer opinions specific to any Defendants in his report. Therefore, Air & Liquid is correct that any testimony he provides at trial cannot make this final leap from "class[es] of product[s]" in general to any Defendant's product in particular. Dr. Finkelstein cannot take the stand and opine, for instance, that Mr. Marcus's exposure to Buffalo pumps constituted a "substantial factor" in his developing mesothelioma given that he did not offer that opinion in his report. And to the extent that Defendants are concerned about jurors prejudicially collapsing the distinction between exposure from gaskets generally and exposure from, say, Air & Liquid gaskets specifically, nothing stops them from driving home the import of that distinction through cross examining Dr. Finkelstein. Of course, Defendants may also object to any testimony offered by Dr. Finkelstein that goes beyond the opinions detailed in his report, or that purports to rely on an "every exposure" theory. But the Court is otherwise satisfied that the opinions offered in Dr. Finkelstein's expert report are reliable, and finds them admissible under FRE 702 and *Daubert*. It accordingly **DENIES** Air & Liquid's motion.

### c. "Every Exposure" Testimony

Defendant Warren Pumps, LLC ("Warren") seeks to exclude expert testimony or evidence from several witnesses on the ground that all of this evidence is based on an "every exposure" theory. *See* Dkt. No. 369-1.[7] The Court will **DENY** the motion.

Under the "every exposure" theory, every exposure to asbestos contributes to the total dose and is a substantial factor in causing disease. *See, e.g.*, *McIndoe*, 817 F.3d at 1177. Defendants suggest that this "every exposure" theory is embedded within the opinions of Plaintiffs' experts – namely Michael Ellenbecker (industrial hygienist), Dr. Allen Brody (pulmonary pathologist), Dr.

---

[7] The following Defendants filed notices or motions of joinder to Warren Pumps, LLC's motion: Velan Valve Corporation (Dkt. No. 373); Air & Liquid Systems Corporation (Dkt. No. 374); BW/IP, Inc. (Dkt. No. 377); Plant Products & Supply Co. (Dkt. No. 378); Greene, Tweed & Co. (Dkt. No. 383); Gardner Denver (Dkt. No. 385); William Powell Company (Dkt. No. 386); Armstrong International (Dkt. No. 387); Electrolux Home Products, Clark Reliance Corporation, Spirax Sarco, Flowserve US Inc., and Rockwell Automation, Inc. (Dkt. No. 397); Eaton Corporation (Dkt. No. 400); BWDAC, Inc. (Dkt. No. 401); and Cleaver Brooks, Inc. and Hill Brothers Chemical Company (Dkt. No. 441).

United States District Court
Northern District of California

1   Allan Smith (general causation expert), and Dr. Murray Finkelstein (epidemiologist) – and should

2   consequently be excluded.  *See* Dkt. No. 369-1.  Plaintiffs, for their part, deny that any of their

3   experts intend to rely on an "every exposure" theory.  Dkt. No. 451.

4   　　　　Throughout its briefing, Warren states that Plaintiffs' experts do not offer any specific

5   causation opinion that Mr. Marcus's asbestos exposure was "attributable to Warren" products, and

6   failed to perform quantitative dose reconstruction.  *See* Dkt. No. 369-1 at 5, 14.  Defendants thus

7   anticipate that Plaintiffs will argue that "every asbestos exposure above background [levels] is a

8   substantial factor" in causing Mr. Marcus' disease.  *See id.* at 7.  Defendants extract short

9   statements from the expert reports and deposition testimony of Plaintiffs' experts to support this

10  conjecture.  For example, Warren draws attention to Dr. Brody's report for stating that "[l]ung

11  cancer and mesothelioma are cumulative diseases" such that "[e]ach exposure to asbestos that an

12  individual with lung cancer or mesothelioma experienced in excess of a background level

13  contributes to the development of the disease," and to Dr. Smith's report for opining that "all

14  asbestos dust inhalation contributes to the causal dose," and that Mr. Marcus' mesothelioma was

15  "caused by inhalation of asbestos dust."  Dkt. No. 369-1 at 13–14.  Yet Defendants do not proffer

16  any citations to these experts' reports or deposition testimony to support their contention that

17  Plaintiffs intend to rely on these statements to conclude that every exposure to asbestos was a

18  substantial factor in Mr. Marcus's disease.  In fact, as to Dr. Brody, Plaintiffs specifically state that

19  Dr. Brody will not provide specific causation opinions, and moreover "will not provide testimony

20  specific to Mr. Marcus'[s] exposures."  Dkt. No. 451 at 7.  Warren also stresses that Dr.

21  Finkelstein opines in his report that "inhalation of asbestos fibers of any type, from any source or

22  product, causes mesothelioma . . . ."  Dkt. No. 369-1 at 13.  But the cited snippet is from a part of

23  Dr. Finkelstein's report that simply explains the prevailing view that asbestos is the medical cause

24  of mesothelioma; it does not purport to suggest that every single one of Mr. Marcus's asbestos

25  exposures meaningfully contributed to his mesothelioma.  In any event, the Court has already

26  rejected the argument that Mr. Finkelstein's opinions rest upon an "every exposure" theory of

27  liability, and does so again here.

28  　　　　In short, none of Plaintiffs' experts appear to rely on an "every exposure" theory of

United States District Court
Northern District of California

liability, and the Court declines the invitation to speculate that they will do so at trial. To the extent Plaintiffs' experts attempt to offer "every exposure" opinions (notwithstanding their reports), such testimony will be excluded. *See, e.g., McIndoe*, 817 F.3d at 1177 (rejecting "every exposure" theory because it would "permit imposition of liability on the manufacturer of any [asbestos-containing] product with which a worker had the briefest of encounters on a single occasion") (quotation omitted); *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673–77 (7th Cir. 2017) (same). If this case proceeds to trial, the Court will consider holding a voir dire hearing outside the presence of the jury to confirm in advance that Plaintiffs' experts will only offer reliable and relevant opinions that are not premised on an impermissible "every exposure" theory.

> d.   Christopher Herfel

Plaintiffs have moved to prevent Defendants' proffered naval expert, Christopher Herfel, from testifying at trial. Dkt. No. 413-1. The Court will **GRANT IN PART and DENY IN PART** Plaintiffs' motion.

The Court begins with a brief overview of Mr. Herfel's background. Mr. Herfel holds a Bachelor of Science degree from the U.S. Merchant Marine Academy, Kings Point, NY, in Marine Engineering with a minor in Shipyard Engineering Management. Dkt. No. 413-2, Ex. C ("Herfel CV"). He also earned a Master of Business Administration from Loyola University, Maryland, and holds a Third Assistant Engineer's License issued by the Coast Guard. *Id*. After graduation, Mr. Herfel served as an Officer in the United States Naval Reserve for eight years, obtaining the rank of Lieutenant. Dkt. No. 448 at 4. During his Naval Reserve career, he gained "experience and expertise in maintenance, upkeep, activation, and deactivation of U.S. Navy and merchant ships located in Ready Reserve Fleet," and also completed various training courses focused on ship maintenance and repair. Herfel CV at 3. While completing his reserve duties, Mr. Herfel also worked for five years at Baltimore Marine Industries, where he was "involved with the new construction of barges and industrial products, the repair and conversion of commercial vessels, and the scrapping of former U.S. Navy vessels." *Id*. Since 2003, Mr. Herfel has worked at McCaffery and Associates, Inc., "a maritime and naval consulting firm that specializes in the research and analysis of U.S. Navy, Coast Guard and other federal government agency documents,

United States District Court
Northern District of California

United States District Court
Northern District of California

1  records, plans, photographs and publications regarding ship design, construction, maintenance,

2  repair and conversion," as well as "merchant marine personnel training, government contracting

3  and purchasing, personnel safety and health, use of asbestos on naval ships, government

4  specifications for the use of asbestos on naval ships and knowledge of the federal government and

5  Navy concerning the hazards of asbestos and other known toxic materials." *Id* at 2.  He currently

6  serves as CEO of the firm.  *Id*.

7        Plaintiffs argue that Mr. Herfel's exclusion is warranted for multiple reasons.  First, they

8  contend that Mr. Herfel lacks specialized knowledge, training, or expertise on the topics about

9  which he testifies, and is instead just a locator and reviewer of documents.  Dkt. No. 413-1 at 2.

10  Second, they argue that Mr. Herfel's testimony will not assist the trier of fact, as he merely

11  "parrots" as true the contents of the Naval records he reviews (which otherwise would be barred as

12  inadmissible hearsay).  *Id*.  Finally, they maintain that while Mr. Herfel acts as a percipient

13  witness by, for example, testifying that Mr. Marcus did not encounter Defendants' products, he

14  lacks the personal knowledge necessary to make such a claim.  *Id*.

15        Having reviewed Mr. Herfel's report, the Court both agrees and disagrees with aspects of

16  Plaintiffs' assessment.  On the one hand, Mr. Herfel does appear to have specialized knowledge

17  concerning engineering and Naval practices pertinent to this case.  While Mr. Herfel may not be a

18  researcher by training, this is not dispositive.  *See Massok v. Keller Indus., Inc.*, 147 F. App'x 651,

19  656 (9th Cir. 2005) ("[A]n expert need not be officially credentialed in the specific matter under

20  dispute.") (citing *United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993)).[8]  The Court finds

21  credible the contention that Mr. Herfel's education, training and work experience over the past

22  thirty years have vested him with "expertise regarding U.S. Navy ship design, development,

23  maintenance, construction and repair, including U.S. Navy specifications; the level of control and

24  supervision exercised by the U.S. Navy over the design, manufacture and installation of

25  equipment and machinery aboard a U.S. Navy vessel; the use of asbestos on U.S. Navy ships and

26  in shipyards; and publications by the United States government and the U.S. Navy concerning

27

28    [8] As an unpublished Ninth Circuit decision, *Massok v. Keller* is not precedent, but may be considered for its persuasive value. See Fed. R. App. P. 32.1; CTA9 Rule 36-3.

asbestos hazards." Dkt. No. 413-2 ("Herfel Report") at 5. It appears to the Court that this expertise enables Mr. Herfel to locate, interpret and synthesize primary sources (including "original business records, instructions, technical manuals, training manuals, specifications, standards, plans, photographs, daily correspondence, and other publications of the U.S. federal government") relating to military specifications and equipment used aboard various ships in a manner that would assist a trier of fact. *Id*.

However, Plaintiffs are correct that some of the opinions offered in Mr. Herfels' report go beyond his articulated expertise. While Mr. Herfel may opine about the contents of the documents he interprets, he may not do more. Most importantly, he may not make the leap between what the documents say about what should happen in the world and what *actually happened* in the world. For instance, Mr. Herfel may opine about what products appear or do not appear on the Navy's procurement lists, but he may not extrapolate from the documents to testify that a given product was or was not on a Navy ship. But he does just that: for example, after (permissibly) opining that the Navy's Qualified Product Lists ("QPLs") "did not identify Gardner Denver as an approved pump manufacturer" after 1957, he (impermissibly) concludes that "no Gardner Denver pumps were installed on board these U.S. Navy ships" during the period in which Mr. Marcus worked on them. Dkt. No. 413-2 at 146. While the Court understands that Mr. Herfel's view is that a product's absence on the QPLs means that it should not have made its way onto a Navy vessel, maintaining the firm distinction between "should not have" and "did not" is critical in the absence of primary documents confirming the congruence of protocol and reality.[9] But Mr. Herfel blurs the distinction between the two throughout his report. For example, he opines that "any work being performed on board any U.S. Navy ship that Mr. Marcus served or worked aboard was done in accordance with both U.S. Navy policies and federal laws." *Id*. at 124. Or, in the context of valve repair, Mr. Herfel acknowledges that "Mr. Marcus would have had some responsibility for the installation, maintenance, and repair of valves installed in these ship's firerooms," but opines

---

[9] The Court notes that Plaintiffs' expert Captain Burger does not view QPLs as determinative of what products made their way onto Navy vessels in light of the possibility of product substitution in some circumstances, *see* Dkt. No. 460-12 at 32, which further highlights the impropriety of drawing definitive conclusions about real-world occurrences from QPL or other records.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   that "there would have been many Sailors on board the ship who were also responsible for the

2   maintenance and repair of those valves." *Id*. at 127.

3   　　　The Court could go on, but the point is that Mr. Herfel's report makes sweeping statements

4   about what actually happened (as opposed to what the documents say *should have* happened) on

5   the vessels Mr. Marcus served aboard, and he has no basis for doing so.  Defendants may not use

6   Mr. Herfel as a mouthpiece for their legal arguments, and it appears to the Court that Mr. Herfels's

7   report is designed to support the ultimate legal conclusion that "Mr. Marcus could not have been

8   exposed to asbestos from X product on A, B, C ships during Y time."  This is impermissible.

9   Accordingly, the Court will **GRANT** Plaintiff's motion **in part** and **DENY it in part**.  While Mr.

10  Herfel may interpret the content of the documents on which he relies, he may not speculate with

11  respect to how they were applied in the real world absent on-point evidence.

12  　　　At present, Mr. Herfel's current report blends permissible and impermissible opinions and

13  fails to adequately distill the key conclusions in the manner contemplated by Rule 26(a)(2)(B)(i).[10]

14  Therefore, in order to reduce uncertainty about the opinions that Mr. Herfel may provide at trial,

15  the Court **DIRECTS** all Defendants who intend to call Mr. Christopher Herfel as an expert at trial

16  to jointly submit, by July 2, 2024, a filing no longer than four (4) pages that identifies all discrete,

17  factual opinions that Mr. Herfel plans to offer and that are consistent with the holding of in this

18  order.  The opinions should be formatted in bullet point form, with each bullet corresponding to a

19  discrete opinion and citing where in the report that opinion is expressed and supported.  The Court

20  will review the proffered opinions for conformity with this order and make any further rulings as

---

[10] Although Mr. Herfel purports to provide such a statement at pages 147 through 160 of his opinion, this "Opinions and Conclusion" section does not uniformly contain clearly identified Rule 26 opinions, and instead weaves in descriptions of Mr. Marcus's work history and characterizations of his testimony.  Moreover, it also includes conclusions that the Court has found to impermissibly make the leap between document interpreter and diviner of hyper-specific historical realities (*see, e.g.*, "The water level gages on board the U.S. Navy ships that Mr. Marcus served and worked aboard, regardless of manufacturer, *would have had* a sight glass front that allowed the operators to observe the boiler water levels" [Dkt. No. 413-12 at 160 (emphasis added)]; "Evaporators and deaerating feed tanks installed on board the U.S. Navy ships that Mr. Marcus' served and worked aboard *were installed* outside the ships' Firerooms and as such *were not the responsibility* of the Boilermen, like Mr. Marcus, assigned to those ships." [*Id*. (emphasis added)]; "Any consumable materials originally installed in a shipboard equipment or subsequently installed on board . . . *were required and approved by the U.S. Navy in accordance with the applicable specifications and standards for each component*." [*Id*. at 163 (emphasis added)].

12

1   necessary.

2       **B.    Defendants' Motions for Summary Judgment**

3           **i.    Legal Standard**

4       Summary judgment is proper when a "movant shows that there is no genuine dispute as to

5   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

6   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

7   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence

8   in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id*.

9   But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

10  the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

11  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

12  or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),

13  *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court

14  finds that there is no genuine dispute of material fact as to only a single claim or defense or as to

15  part of a claim or defense, it may enter partial summary judgment. *See* Fed. R. Civ. P. 56(a).

16          **ii.    Analysis**

17              a.  <u>Government Contractor Defense</u>

18      Defendants Air & Liquid, Electrolux Home Products Inc ("Electrolux"), Clark Reliance

19  Corporation ("Clark Reliance"), Spirax Sarco Inc. ("Spirax Sarco"), Foster Wheeler, Rockwell

20  Automation Inc. ("Rockwell"), and Velan Valve ("Velan") all argue that the government

21  contractor defense articulated in *Boyle v. United Technologies Corporation*, 487 U.S. 500 (1987),

22  precludes Plaintiffs' claims against them. *See* Dkt. Nos. 388-14 at 12, 357-1 at 5, 382 at 15, 399-1

23  at 3, and 404-1 at 12. Faced with the same argument, this Court ruled in *Elorreaga v. Rockwell*

24  *Automation, Inc.* that the government contractor affirmative defense does not apply to claims

25  brought under federal maritime law. *See* 666 F. Supp. 3d 1032, 1040 (N.D. Cal. 2023)

26  ("*Elorreaga II*"), *motion to certify appeal granted*, No. 21-CV-05696-HSG, 2023 WL 4116623

27  (N.D. Cal. June 16, 2023). The *Elorreaga* Defendants have appealed this aspect of the Court's

28  ruling, but until the Ninth Circuit provides additional guidance, the Court finds no reason to

United States District Court
Northern District of California

1  reconsider its prior reasoning and adopts it in full.  Accordingly, Defendants' motion for summary

2  judgment on this ground is **DENIED**.

3         A smaller group of defendants raises a distinct argument, namely, that they are entitled to

4  derivative sovereign immunity.  *See* Dkt. No. 357 (Clark Reliance, Electrolux, and Spirax Sarco's

5  MSJ), 399 (Rockwell's MSJ).  However, this argument may be distinct but not different, as "it is

6  far from clear" whether derivative sovereign immunity under *Yearsley v. W.A. Ross Const. Co.*,

7  309 U.S. 18 (1940) differs from the "government contractor defense" under *Boyle*.  *Cabalce v.*

8  *VSE Corp.*, 922 F. Supp. 2d 1113, 1126 (D. Haw. 2013), *aff'd sub nom. Cabalce v. Thomas E.*

9  *Blanchard & Assocs., Inc.*, 797 F.3d 720 (9th Cir. 2015).  In other words, the Court is not

10  convinced that Defendants are entitled to raise this as an affirmative defense to federal maritime

11  claims if they are barred from raising the government contractor defense under *Boyle*.  Moreover,

12  even if they could, or if *Boyle* nevertheless applied, the Court is skeptical that summary judgment

13  in Defendants' favor would be appropriate on this factual record.  Accordingly, the Court similarly

14  **DENIES** summary judgment to these Defendants on this basis.

15                b.  Non-Pecuniary Damages

16         Defendants Air & Liquid, BW/IP, Inc. ("BW/IP"), Cleaver Brooks, Inc. ("Cleaver

17  Brooks"), Eaton Corporation ("Eaton"), Foster Wheeler, Gardner Denver Inc. ("Gardner

18  Denver"), Greene, Tweed & Co., Inc. ("GT & Co."), J.R. Clarkson Company LLC ("J.R.

19  Clarkson"), Metalclad, and Velan argue that under federal maritime law, non-pecuniary damage

20  claims are unavailable, and that consequently, Plaintiffs' claims for loss of consortium damages

21  and punitive damages must fail.  *See* Dkt. Nos. 388-14 at 23, 367 at 15, 353-1 at 20, 414-1 at 9,

22  382 at 20, 409-1 at 18, 384-1 at 14, 402-1 at 19, 391-1 at 17, and 404-1 at 23.  Plaintiffs disagree,

23  and maintain that they are entitled to these damages under maritime law.  The same issue came

24  before this Court in *Elorreaga*.  In that case, the Court granted defendants' motion to dismiss Mr.

25  Elorreaga's request for loss of consortium and punitive damages, finding them unavailable under

26  maritime law on the arguments presented.  *See Elorreaga v. Rockwell Automation, Inc.*, No. 21-

27  CV-05696-HSG, 2022 WL 2528600, at *2–6 (N.D. Cal. July 7, 2022) ("*Elorreaga I*").  On the

28  record before it now, this Court finds its prior reasoning sound, and adopts it in full.  Accordingly,

1  the Court **GRANTS** Defendants summary judgment on this basis.[11]

2        That conclusion does not dispose of BWDAC Inc.'s motion, however, as Plaintiff's claims

3  against it arise under California (as opposed to federal maritime) law.  That said, the result does

4  not differ: BWDAC, Inc. ("BWDAC") argues that it is entitled to summary judgment on

5  Plaintiffs' punitive damage claim under California law, and the Court agrees.  The reason is

6  straightforward.  Since Plaintiffs' claims against BWDAC do not survive its motion for summary

7  judgment for the reasons described below, Plaintiffs are not entitled to punitive damages.  *See 569*

8  *E. Cnty. Boulevard LLC v. Backcountry Against the Dump, Inc.*, 6 Cal. App. 5th 426, 430 n.3

9  (2016) ("[A] claim for punitive damages is merely an additional remedy that is dependent on a

10  viable cause of action for an underlying tort.") (alteration in original).  The Court will accordingly

11  **GRANT** BWDAC's motion as to Plaintiffs' claim for punitive damages.

12        c.  <u>Negligent Misrepresentation and Fraud by Nondisclosure Claims</u>

13        Defendants Air & Liquid, BW/IP, Gardner Denver, GT & Co., J.R. Clarkson, Metalclad,

14  PPS, and Velan argue that they are entitled to partial summary judgment on Plaintiffs' negligent

15  misrepresentation and fraud by nondisclosure claims.  *See* Dkt. No. 388-14 at 23, 367 at 14, 409-1

16  at 22, 384-1 at 17, 402-1 at 19, 391-1 at 12, and 404-1 at 23.  Plaintiffs do not disagree.  *See, e.g.*,

17  Dkt. No. 463 at 6 ("Plaintiffs do not oppose [Air & Liquid's] Motion for Partial Summary

18  Judgment as to Plaintiffs' claims for negligent misrepresentation and fraud").  Accordingly, the

19  Court **GRANTS** Defendants summary judgment on these claims.

20

21        d.  <u>Vicarious Liability and Contractor/Premises Liability Claim</u>

---

22  [11] A small group of Defendants argue that Mrs. Marcus's loss of consortium claim fails because it
23  is derivative of Mr. Marcus's claims, which are barred by immunity doctrines.  *See* Dkt. No. 357-1
   at 9 (Clark Reliance, Electrolux, and Spirax Sarco's MSJ); 399-1 at 2 (Rockwell's MSJ); *see also*
24  *Jablonski v. Royal Globe Ins. Co.*, 204 Cal. App. 3d 379, 388 (1988) ("[I]f [the underlying] claims
   are barred, [the spouse's] derivative cause of action for loss of consortium is similarly proscribed .
25  . . .").  The Court will not substitute or extrapolate one defendant's arguments for another's, so the
   Court will consider only the argument on this point actually raised by Clark Reliance Corporation,
26  Electrolux Home Products, Inc., and Spirax Sarco, Inc. and Rockwell in their motions: that
   because Mr. Marcus's claim faces an immunity bar, Mrs. Marcus's does, too.  (It will not, in other
27  words, construe these arguments as a challenge to Mrs. Marcus's ability to recover loss of
   consortium damages under maritime law.)  Since the Court ruled that Mr. Marcus's claims are *not*
28  precluded by such a bar, it follows that Mrs. Marcus's are not, either.  Accordingly, the Court
   **DENIES** these defendants summary judgment on this ground.

United States District Court
Northern District of California

Defendant Metalclad moves for summary judgment on Plaintiffs' vicarious liability and contractor/premises liability claims, arguing that because it was not in control of Mr. Marcus's worksites, it cannot be held liable for any harm which occurred there.  Dkt. No. 391-1 at 17.  Metalclad is correct in positing that the key question in analyzing contractor/premises liability is whether the defendant exercised ownership, possession, and control.  *See Donnell v. Cal. W. Sch. of Law*, 200 Cal. App. 3d 715, 725 (1988).  Since Plaintiffs have not furnished any evidence that Metalclad in fact exerted control over the Naval worksites and vessels where its contractors installed insulation, there is no triable issue of material fact on this point.  The Court finds the same is true for Plaintiffs' vicarious liability claim, which ascribes blame to Metalclad for its "employees" (i.e. its hired workers, contractors and/or other personnel) "negligently disturb[ing]" asbestos-containing products in Mr. Marcus's vicinity.  Compl. ¶¶ 76-92.  Metalclad maintains that this claim fails because it did not control the premises and did not owe Mr. Marcus a duty of care.  While it is not obvious to the Court that no such duty was owed, Plaintiff fails to adequately respond to Metalclad's arguments concerning control, and lumps together its opposition to both the vicarious liability and contractor/premises liability claim without any citations to evidence that supports its theory.  In short, Plaintiffs have failed to marshal sufficient legal arguments or factual evidence to introduce a disputed fact as to this claim, which appears to be a throw-in.

Accordingly, the Court will **GRANT** Metalclad's motion for summary judgment as to these two claims.

e. Causation

Lastly, and more substantively, Defendants argue that Plaintiffs lack sufficient evidence to establish that their products caused Mr. Marcus's mesothelioma.[12]  Plaintiffs bear the burden of establishing that exposure to Defendants' products was a substantial contributing factor in causing Mr. Marcus's illness.  *See McIndoe*, 817 F.3d at 1174, 1176–77.  The Ninth Circuit has explained that "a party may satisfy the substantial-factor test by demonstrating that the injured person had

---

[12] Most Defendants analyze this question exclusively under maritime law, though some also discuss what would result if California law were applied in the alternative.  *See, e.g.*, Dkt. No. 409-1 at 14.  As maritime law *does* apply, the Court will not address causation arguments analyzed under California law.

United States District Court
Northern District of California

substantial exposure to the relevant asbestos for a substantial period of time." *Id*. at 1176 (emphasis added).  In other words, plaintiffs may proffer evidence regarding "the amount of exposure" or "the duration of such exposure." *Id*. at 1176–77 (emphasis in original); *see also Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (explaining that proximate cause may be established with evidence that exposure to asbestos-containing product was "sufficiently sustained (or frequent) and intense") (quotation omitted).  The Court contrasted such evidence with "[e]vidence of only minimal exposure to asbestos," which "is insufficient." *McIndoe*, 817 F.3d at 1176.  There must be "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id*. (quotation omitted).

As this Court has acknowledged, "there are of course 'inherent practical difficulties, given the long latency period of asbestos-related disease,' in establishing causation from work performed several decades ago." *Elorreaga II*, 666 F. Supp. at 1041 (quoting *In re Toy Asbestos*, No. 19-CV-00325-HSG, 2021 WL 1167638 (N.D. Cal. Mar. 26, 2021)).  Plaintiffs often lack direct evidence of causation, and often must rely on circumstantial evidence.  Defendants urge that Plaintiffs lack sufficient evidence showing the amount or duration of Mr. Marcus's exposure attributable to any of their specific products, and that they are accordingly entitled to summary judgment in their favor.

Before turning to these arguments, the Court makes a preliminary point.  To support various of their opposition briefs, Plaintiffs submitted expert declarations by Captain Burger and/or Dr. Ellenbecker.  Numerous Defendants objected to these declarations, arguing that they went outside the scope of the experts' original reports and offered substantively new opinions. *See, e.g.*, Dkt. No. 507 ("Captain Burger's Rule 26 report contains no specific opinions as to Buffalo Pumps . . . . Now, months later faced with a dispositive motion, Captain Burger submits a declaration with a new opinion related to Buffalo Pumps not contained in the Rule 26 expert report.").   For example, even though Dr. Ellenbecker's expert report did not make causation findings as to any individual defendant, the declarations filed on his behalf in Plaintiffs' opposition briefing opined that their products substantially contributed to Mr. Marcus's disease.

*See, e.g.*, Dkt. No. 458-7, ¶ 31 ("The exposures Mr. Marcus suffered as a bystander from work with [Plant Product & Supply Co.] thermal insulation were significant, occurred over a substantial period of time, and increased his risk of developing mesothelioma."). The Court agrees that aspects of the preferred declarations offer materially different and previously undisclosed opinions specific to each Defendant that go beyond the realm of supplementation, in violation of Rule 26. Accordingly, to the extent that Captain Burger or Dr. Ellenbecker offers defendant-specific or otherwise undisclosed testimony in their declarations, the Court **SUSTAINS** the objections raised by Air & Liquid, BW/IP, Cleaver Brooks, Clark Reliance, Electrolux, Spirax Sarco, Inc., J.R. Clarkson, PPS, Rockwell, and Warren.[13]

### 1. Exposure to Asbestos

Defendants first argue that Plaintiffs lack evidence that Mr. Marcus was actually exposed to asbestos from their products.[14] In evaluating the parties' arguments, the Court considers the evidence in the light most favorable to Plaintiffs – as it must at this stage. *See Matsushita*, 475 U.S. at 587–88.

- **Air & Liquid Systems Corporation**

Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing gaskets and packing associated with Buffalo Pumps.[15] Air & Liquid responds that Plaintiffs lack sufficient evidence to support this contention. Dkt. No. 388-14 at 20.

Mr. Marcus testified that during his 17 years working as a boiler technician and repairman, he worked on Buffalo pumps "too many" times to count. Dkt. No. 463-2, Ex. A ("Marcus Depo.") Volume I, 57:17-19. He identified the pumps as Buffalo pumps because they had the name "Buffalo" molded onto the metal casing of the pump. *Id*. II, 344:14-21. When working on pumps

---

[13] While some of these Defendants improperly filed separate evidentiary objections, each Defendant *also* raised its evidentiary objection to the given expert declaration in the body of its reply brief.

[14] Only Defendants Clark Reliance and Foster Wheeler do not raise arguments challenging Mr. Marcus's actual exposure to asbestos in their products. The Court highlights this not to suggest that these defendants have waived this argument or conceded this prong of the causation analysis, but rather to explain why they are not discussed in this section.

[15] Air & Liquid acknowledges that it is a "successor by merger to Buffalo Pumps, Inc." Dkt. No. 388-14 at 6.

United States District Court
Northern District of California

of this kind, Mr. Marcus performed "minor repairs to major repairs." *Id.* I, 51:3-5; *see also* Marcus Depo. III, 346:24-347:16 (affirming that he performed "minor to major" work on Buffalo pumps specifically).  "Minor repairs" included "repacking, lubrication, [and] cleanliness" and "major repairs" encompassed "overhaul[ing]" the pump. *Id.* I, 51:7-10.  To repack the pumps, Mr. Marcus used packing pullers to pull out the old packing, resulting in "[d]irty" conditions. *Id.*, 51:11-52:4.  When completely overhauling a pump, Mr. Marcus broke the pump's casing open, removed the packing, removed all the old gaskets, and cleaned the casing so that it could be reassembled according to the manufacturer's specifications. *Id.*, 53:2-19.  He removed the old internal gaskets from the pump with a knife, a scraper, or by hand, and then cleaned off residual gasket material from the casing using a pneumatic wire brush. *Id.*, 53:21-54:9, *id.* III, 346:24-347:16.  This created "dirty and dusty" conditions. *Id.* I, 54:6-15.

Buffalo appears to admit that during the relevant timeframe in this case, the gaskets and packing that it initially supplied with its pumps to the *USS Trippe*, *USS Constellation*, *USS Kitty Hawk*, and the *USS Hancock* contained asbestos. *See* Dkt. No. 463-4, Ex. C (January 9, 2024 Deposition of Martin Kraft, Air & Liquid's PMQ), at 44:17-45:12.  Although Buffalo insinuates that it can only be held liable for gaskets and packing original to its pumps, Mr. Marcus testified that all the replacement gaskets that he used on pumps were the manufacturer's OEM, such that all the replacement gaskets he used on Buffalo pumps, for example, were Buffalo's gaskets. *See* Marcus Depo. VIII, 54:20-55:5, 888:22-24, 899:11-23, *see also* Dkt. No. 463-3, Ex. B ¶ 13 (sworn declaration of Mr. Marcus stating that "manufacturers further supplied OEM replacement component parts for maintenance and repair of the equipment.").  That is significant because Buffalo, through its person most knowledgeable, testified in prior litigation that through the mid-1980s, gaskets and packing supplied with or for Buffalo pumps contained asbestos. *Id.* at 114:4-115:7, 120:23-121:1; *see also* Dkt. 463-5, Exhibit D at 60:1-15, 88:7-20, 90:2-90:23, 98:3-9 (PMQ testifying on January 20, 2004 in *Peterson v. Ashland, Inc., et al* that except for submarine pump specifications that called for rubber O ring and cork gaskets, he was not aware of Buffalo pumps that did not use asbestos-containing packing prior to the early 1980s).

Plaintiffs have therefore presented evidence that Buffalo made its products with asbestos

and knew that asbestos-containing pump components would require replacement with similar

asbestos-containing parts.  *See Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 457.  The Court

therefore finds that this Defendant has not met its burden of showing that it is entitled to summary

judgment on Plaintiffs' negligence and strict liability claims.[16]

- **BW/IP**

Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing gaskets and packing

associated with Byron Jackson pumps, which BW/IP admits it is responsible for.  *See* Dkt. No.

367 at 8, fn. 1.  BW/IP responds that Plaintiffs lack sufficient evidence to support this

contention.[17]  Dkt. No. 367 at 11-12.

Mr. Marcus testified that he worked on "too many [Byron Jackson pumps] to count"

throughout his time on Naval ships.  Marcus Depo. VI, 596:4-12.  He was able to identify the

pump manufacturer of pumps he worked on, such as Byron Jackson, based on the manufacturer

names being "right in the casing."  *Id*. I, 57:13-16.  The nature of the work performed on Byron

Jackson pumps appears to be consistent with types of "minor" and "major" repairs Mr. Marcus

testified to and the Court described in detail above as to the valves.  Although the Court agrees

with BW/IP that Mr. Marcus's testimony fails to describe with particularity his experience with

Byron Jackson pumps by, for instance, tracing Byron Jackson pumps to a given vessel, *see* Dkt.

Nos. 367 at 8, 501 at 3, the Court must credit Mr. Marcus's testimony that his inability to provide

---

[16] Plaintiffs lodge an evidentiary objection to the Declaration of Martin Kraft submitted in support of Buffalo's motion for summary judgment at Dkt. No. 388-3, Ex. B, arguing that he lacks personal knowledge for the statements made in paragraphs 5 through 41 of his declaration, which concern the Navy's design, manufacturing and performance specifications for Navy pumps.  Dkt. No. 463 at 16–17.  Since the Navy's procurement practices during the time period relevant to this case almost entirely predate Mr. Kraft's employment with Buffalo, Plaintiffs argue that under Rule 602, Mr. Kraft cannot have "knowledge produced by the direct involvement of the senses" about the matters discussed in his declaration prior to 1981.  *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014).  Since this testimony is pertinent to the government contractor defense, which the Court will not consider having found as a matter of law that the government contractor defense inapplicable, the Court deems the objection **MOOT**.

[17] Concurrently with its reply, Defendant BW/IP lodged separate evidentiary objections to exhibits Plaintiffs filed to support their MSJ opposition.  However, BW/IP's companion filing is in violation of Local Rule 7-3(c), which requires that "[a]ny evidentiary and procedural objections to the opposition . . . be contained within the reply brief or memorandum."  Accordingly, the Court will disregard BW/IP's unsanctioned filing at Dkt. No. 501-1, and will instead evaluate its evidentiary objections based only on whatever argument BW/IP included in the body of its reply.

United States District Court
Northern District of California

an "accurate estimate" for how many Byron Jackson pumps he worked on stems from the high incidence of that experience, rather than the opposite.

Further, Plaintiffs point to the testimony given in a separate matter by BW/IP's corporate representative, Joseph Costanzo, to show that Byron Jackson pumps incorporated asbestos-containing gaskets and packing rings from approximately the 1950s until some point in the 1980s, and that Byron Jackson did not have a non-asbestos substitute material for its packing and gaskets until the early to mid-1980s.  *See* Dkt. No. 453 (Opp.); *see also* Dkt. No. 453-3, Ex. B (excerpts from the deposition of BW/IP corporate representative Joseph Costanzo taken August 20, 2013 in *Garvin v. Agco Corporation f/k/a Allis Chalmers Company, et* al.) at 8:15-18 ("Q: Bryon Jackson included asbestos-containing components from the 1950s until at some point in the 1980s; is that correct? A: That's correct."); 14:10-14 ("Q: [F]rom at least the 1950s until sometime in the '80s, perhaps up to '89, Byron Jackson supplied replacement asbestos parts to its customers if they asked for them; correct? A: Correct.").  While BW/IP objects that Mr. Costanzo's excerpted testimony from *Garvin* should be excluded as "irrelevant," Dkt. No. 501 at 3, the Court disagrees and overrules the objection.  Mr. Costanzo's testimony is highly relevant: it speaks directly to the question of whether Byron Jackson pumps incorporated asbestos-containing new and replacement components during the relevant period, and answers it in the affirmative.

Since Plaintiffs have proffered evidence tending to show that Mr. Marcus worked frequently with Byron Jackson pumps and that those pumps incorporated asbestos-containing components during the relevant timeframe, the Court finds that BW/IP has not met its burden of showing that it is entitled to summary judgment on this question.

- **BWDAC, Inc.**

Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing clutches and clutch components manufactured, sold, supplied, and distributed by BWDAC while performing automotive friction work.[18]  BWDAC responds that Plaintiffs lack sufficient evidence to support

---

[18] Unlike the other claims discussed in this motion, Plaintiffs' claims against BWDAC, Inc. do not proceed under maritime law.  His claims against BWDAC, Inc. arise from Mr. Marcus's civilian automotive clutch work, rather than from his role in Naval boiler maintenance and repair.

United States District Court
Northern District of California

this contention.  Dkt. No. 415 at 6.[19]

BWDAC argues that Plaintiffs have not proffered any evidence that Mr. Marcus purchased clutches supplied or manufactured by BWDAC.  The parties do not dispute that Mr. Marcus did not buy BWDAC-manufactured clutches: he testified that he only purchased "BorgWarner" brand clutches because he did not like "off-brand" materials, Marcus Depo. VII, 760:24-761:4, and that he always purchased them new, *id*., 761:20-762:17, 764:10.  While this would facially appear to suggest that Mr. Marcus did not purchase any BWDAC clutches, BWDAC did *resell* new Borg Warner clutches under the Borg Warner brand name and label.  *See* Dkt. No. 465:4, Ex. C (Deposition of Defendant's Person Most Qualified, William Kotzum, in *Lepore v. ACandS, Inc. et al*.), at 53:23-54:15.  Plaintiffs argue that Mr. Marcus was exposed to these resold BorgWarner clutches, which contained asbestos.  However, BWDAC maintains that Mr. Marcus's testimony forecloses that conclusion, because the new BorgWarner clutches that it resold were "generally . . . packaged in boxes that used a Borg-Warner trademark in accordance with the agreement and conditions within the trademark agreement, *as well as Defendant's name*."  *See* Dkt. No. 465-7 at 10 (emphasis added).  Mr. Marcus, meanwhile, testified that he could identify the clutch brand as BorgWarner because it was written on the box, but that he did not recall seeing any other "writings, logos or symbols" on the BorgWarner clutch disk boxes.  Marcus Depo. I, 119:25-120:1, *id*. VII, 759:10-21.  In other words, BWDAC argues that because it resold new BorgWarner clutches in boxes that *also* bore BWDAC's name, Mr. Marcus's testimony (that he remembers only the BorgWarner name on the clutch boxes he purchased) means that he did not purchase BorgWarner clutches resold through BWDAC.

The Court finds that on the summary judgment record, BWDAC has not established that *no* material dispute exists as to whether it may have resold the BorgWarner clutches that Mr. Marcus purchased.  Given that BWDAC only "generally" (as opposed to "always") added its

---

[19] Rather than incorporating its evidentiary objections to Plaintiffs' opposition evidence into its Reply as Local Rule 7-3(c) requires, BWDAC, Inc. separately filed a "Request for Evidentiary Ruling" lodging objections to Exhibits B, C, D, E, F, and G to the Oral Declaration.  Dkt. No. 502. Since this filing violated the Local Rules and since BWDAC, Inc. does not otherwise raise these evidentiary objections in the body of its Reply, the Court will **DENY** them.

name to BorgWarner boxes, a reasonable jury could find that the fact that Mr. Marcus did not recall seeing BWDAC's name on the boxes does not eliminate the possibility of BWDAC's resale.[20] Accordingly, the Court will **DENY** BWDAC, Inc.'s motion for summary judgment on this ground.

- **Cleaver Brooks, Inc.**

Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing gaskets, packing, millboard, refractory materials, and insulation associated with boilers supplied by Cleaver Brooks.  Cleaver Brooks responds that Plaintiffs lack sufficient evidence to support this contention.  Dkt. No. 353 at 15–16.

Mr. Marcus testified that he "occasionally" worked on Cleaver Brooks boilers – which he described as "firetube" boilers – during his time in the Navy.  Marcus Depo. I, 60:7-10, 59:4-6.  He identified the boilers as Cleaver Brooks boilers by virtue of the manufacturer's name being "written right on the boiler."  *Id.*, 38:2.  In a declaration submitted in support of Plaintiffs' opposition to Cleaver Brooks' motion for summary judgment, Mr. Marcus described his work with Cleaver Brooks boilers in additional detail.  He stated that when maintaining Cleaver Brooks boilers, he would "replace gaskets on various parts of the boiler, including doors, burner drawers, pump cavities, burner housing, and bulkhead fittings," "use pneumatic wire brushes to remove the stuck-on gaskets," "remove worn packing or gasket rope on these boilers . . . by scraping away at the deteriorated material," and "cut replacement tadpole gasket rope, or packing" using a knife.  Dkt. No. 432-3, ¶¶ 4–6.  Mr. Marcus states that he would sometimes also have to remove and replace the refractory cement by mixing new cement himself, remove damaged millboard by tearing it off, and replace external insulation.  *Id.*, ¶¶ 7-9.  He described these processes as "dusty," "very dusty," "dirty and dusty," and involving "a lot of dust."  *Id.* ¶¶ 4, 7, 9.  Mr. Marcus testified that he could not identity the ships or vessels on which he saw Cleaver Brooks boilers because "there was [sic] too many."[21]  *Id.* IV, 439:19-22.

---

[20] Though BWDAC references its licensing agreement with BorgWarner, it does not point the Court to where in that licensing agreement, for example, it was apparently required to add its name to the boxes.

[21] Mr. Marcus also testified to working with Cleaver Brooks boilers in the Big Horn County

United States District Court
Northern District of California

United States District Court
Northern District of California

In arguing that Mr. Marcus was not exposed to asbestos through its products, Cleaver Brooks does not so much argue that their boilers and the boilers' components did not contain asbestos, but rather that their boilers were not aboard the ships that Mr. Marcus remembers by name.[22] Dkt. No. 353 at 8–9.  It asserts that the propulsion boilers installed in the *USS Hancock* and *USS Kawishiwi* were manufactured by Babcock & Wilcox Company, that those in the *USS Bryce Canyon* and the *USS Kitty Hawk* were manufactured by Foster Wheeler Corporation, and that the boilers on the *USS Trippe* were manufactured by Combustion Engineering.  *Id*.  But as Plaintiffs point out, Mr. Marcus testified that he worked aboard many other vessels beyond those he identified by name during his deposition, stating that there were "too many to count." Marcus Depo. I, 29:15-30:7.  As a result, Defendants have not, as they urge, provided "conclusive evidence that the boilers aboard Marcus's ships were not supplied by Cleaver Brooks," since Mr. Marcus served on more ships than the five he discusses.  Dkt. No. 353 at 13.  Instead, the question of whether he was exposed to Cleaver Brooks boilers and replacement components during his Naval service (even if not on the *USS Hancock*, *USS Kawishiwi*, *USS Bryce Canyon*, *USS Kitty Hawk*, or the *USS Trippe*) is heavily contested.  As such, the Court declines to grant Cleaver Brooks summary judgment on this ground.

- **Eaton Corporation**

Plaintiffs allege that Mr. Marcus was exposed as a bystander to electricians' work on asbestos-containing electrical equipment, such as breakers, control boxes, and switchboards associated with Eaton.  Eaton, which was formerly known as the Cutler-Hammer company, does not dispute this in its moving papers.  Dkt. No. 414 at 6 (reciting the two-prong causation standard, and then arguing that the second "substantial factor" prong is not met).  Only in its reply

---

School District.  Marcus Depo., IV 438:21-439:15.  Cleaver Brooks asserts that a "comprehensive search" of shipping records "revealed no shipments of any Cleaver Brooks boilers to Plaintiff's identified jobsites at Big Horn Middle School and Big Horn Elementary School in Wyoming." Dkt. No. 353 at 9.

[22] In fact, Cleaver Brooks does not rebut or otherwise respond to the evidence put forward by Plaintiffs in their opposition showing that Cleaver Brooks firetube boilers incorporated asbestos-containing gaskets, millboard, refractory cement, packing, and insulation, and that Cleaver Brooks installed only asbestos-containing parts in its boilers, which it also manufactured.  Dkt. No. 432 at 7–8.

1   does Eaton raise doubts about Plaintiff's actual bystander exposure to its asbestos-containing

2   electrical products.  Dkt. No. 489.  The Court, however, will not consider arguments raised for the

3   first time on reply, and therefore finds that Eaton has not met its burden of establishing that no

4   material dispute exists as to Mr. Marcus's actual exposure to its asbestos-containing electrical

5   equipment.[23]  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not

6   consider arguments raised for the first time in a reply brief.").

- **Gardner Denver, Inc.**

8       Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing gaskets and packing

9   associated with Gardner Denver pumps.  Gardner Denver responds that Plaintiffs lack sufficient

10  evidence to support this contention.  Dkt. No. 409-1 at 9.

11      Mr. Marcus testified that he worked on Gardner Denver pumps on "too many [ships] to

12  count" throughout his time in the Navy.  Marcus Depo. VI, 401:12-18.  He was able to identify

13  Gardner Denver products because the brand name was "molded into the casing of the pump."  *Id*.,

14  401:23-402:2.  Mr. Marcus recalls encountering Gardner Denver pumps in the fireroom or a

15  "fireroom/engine room combination."  *Id*. IV, 408:1-4.  Though he does not differentiate between

16  the work he performed on Gardner Denver pumps and the work he performed on other brands of

17  pumps, the Court understands his general testimony (discussed above) concerning the "minor" and

18  "major" pump repairs he performed to characterize his dealings with Gardner Denver pumps as

19  well.

20      Gardner Denver does not argue that its pumps could not have contained asbestos; it instead

21  contends, based on the expert report of Mr. Herfel, that Mr. Marcus could not have encountered

22  Gardner Denver pumps because "no Gardner Denver pumps were in the fire room or main

23  engineering spaces," and as a result, the pumps that were present were serviced by machinist

24  mates rather than boiler technicians like Mr. Marcus.  Dkt. No. 409-1 at 7 (citing Herfel Report).

25

---

26  [23] Additionally, the Court observes that rather than incorporating its evidentiary objections to
    Plaintiffs' opposition evidence into its Reply as Local Rule 7-3(c) requires, Eaton separately filed
27  a "Request for Evidentiary Ruling" lodging objections to Exhibits B, C, D, E, F, and G to the Oral
    Declaration.  Dkt. No. 504.  Since this filing violated the Local Rules and since Eaton does not
28  otherwise raise these evidentiary objections in the body of its Reply, the Court will **DENY** them.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    But as the Court has indicated, Mr. Herfel has no basis to definitively conclude that just because

2    documents indicate that Gardner Denver pumps were not approved on Navy's QPL lists during the

3    relevant time period, none were in certain rooms in certain vessels in the real world.  Rather than

4    conclusively "establishing" anything as claimed, Gardner Denver's motion and thinly supported

5    expert declaration only highlight the existence of the factual dispute: on one hand, Mr. Marcus

6    testified that he encountered Gardner Denver pumps on "too many [ships] to count," and on the

7    other, Mr. Herfel opines that it could not have been so based on the QPLs.[24]  With the parties at

8    factual loggerheads on Mr. Marcus's exposure to asbestos-containing Gardner Denver pumps, the

9    Court cannot grant Gardner Denver summary judgment on this issue.

10                              • **Greene, Tweed & Co., Inc.**

11           Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing Palmetto packing

12   associated with GT & Co.  GT & Co. does not seriously dispute this in its moving papers, stating

13   only that "Plaintiffs' experts provide no specific opinions as to Greene Tweed and Mr. Marcus's

14   potential exposure from the same."  Dkt. No. 384-1 at 8.  Only in its reply does GT & Co. raise

15   substantive arguments about Plaintiff's actual exposure to its asbestos-containing products,

16   arguing that braided Palmetto packing was available in asbestos-containing and *non*-asbestos-

17   containing formats.  Dkt. No. 493 at 2–3.  While this argument does not strike the Court as

18   particularly compelling, that impression is neither here nor there: the Court will not entertain

19   arguments raised for the first time on reply.  Therefore, it finds that GT & Co. has not met its

20   burden of establishing that no material dispute exists as to Mr. Marcus's actual exposure to

21   asbestos-containing Palmetto packing, and will **DENY** summary judgment on this ground.

22   *Zamani*, 491 F.3d at 997.

23                              • **J.R. Clarkson Company LLC**

24           Plaintiffs allege that Mr. Marcus was exposed to asbestos-containing gaskets and packing

25   associated with Kunkle valves.[25]  J.R. Clarkson responds that Plaintiffs lack sufficient evidence to

26   _____

27   [24] Plaintiffs, in their opposition, cite numerous pieces of evidence to show that Gardner Denver
     pumps and replacement components contained asbestos.  Dkt. No. 462 at 7.  Gardner Denver did
28   not file a reply, and therefore did not put any of that evidence at issue.
     [25] J.R. Clarkson does not dispute that it is the successor to the Kunkle Valve Company.  Dkt. No.

1    support this contention.  Dkt. No. 402 at 14–16.

2         Mr. Marcus testified that he worked on Kunkle valves "so many times" during his service

3    and removed their packing "too many [times] to count."  Marcus Depo VI, 653:22-25, 655:12-17.

4    He was able to identify the valves he worked on as Kunkle valves because the manufacturer name

5    was "right on the casting on the body."  *Id*., 652:13-15.  Mr. Marcus's work with valves involved

6    "[a]nything from repacking and lubrication to reseating."  *Id*. I, 60:18-24.  To repack the valves,

7    Mr. Marcus used a packing puller to pull out the packing, and then blew the valve out, before

8    replacing the packing according to the manufacturer's specifications.  *Id*., 61:3-9.  The conditions

9    when he pulled out the old packing were "dusty and dirty", and the conditions when blowing out

10   the valve with compressed air were "dirty."  *Id*., 61:12-24, 62:6-14.  Reseating the valve is a

11   "major overhaul" and required taking the bonnet off, scraping off gaskets, and blowing out the

12   valve before putting it back together.  *Id*., 62:15-63:63:16.  The conditions when scraping off the

13   gasket and using compressed air were again "[d]irty . . . [d]irty, dusty."  *Id*, 63:14-64:1. Plaintiffs

14   point to testimony given by various of J.R. Clarkson's representatives for the proposition that

15   Kunkle "supplied asbestos-containing gaskets and packing as valve components prior to the mid-

16   1980s," and also specified asbestos-containing replacement components for its valves.  Dkt. No.

17   459 at 7 (citing depositions of J.R. Clarkson's representatives in this case [Dkt. No. 459-2, Ex. A

18   at 6:10-7:19, 36:3-21] and in *Johnson v. Air & Liquid Systems Corporation, et al* [Dkt. No. 459-3,

19   Ex. B at 12:16-13:18, 62:20-63:1, 63:10-19, 130:11-132:21]).

20        J.R. Clarkson argues that Plaintiffs' evidence is insufficient to show exposure to asbestos-

21   containing valves and components for a variety of reasons.  For example, J.R. Clarkson argues that

22   it never made globe and gate valves (which Mr. Marcus testified to using) and that Plaintiffs have

23   not shown that J.R. Clarkson required replacement components to contain asbestos.  *See* Dkt. Nos.

24   402-1 at 14–16, 495 at 2–8.  It also argues that its corporate representatives only spoke to packing

25   (as opposed to gaskets *and* packing) as asbestos-containing.  These are substantial points, and J.R.

26   Clarkson may well prevail on them.  But at this stage, the Court finds that, while Plaintiffs'

27

28   _____

     402 at 5.

United States District Court
Northern District of California

1   evidence is not overwhelming, there is a genuine dispute as to whether the Kunkle valves and

2   component packing that Mr. Marcus worked on contained asbestos when the evidence is viewed in

3   the light most favorable to Plaintiffs.[26]  For instance, there is no indication that Mr. Marcus

4   worked *exclusively* on globe and gate valves (his testimony makes clear that he worked on

5   different kinds of Kunkle valves, Marcus Depo VI, 653:5-9), and both parties appear to

6   acknowledge that even if Mr. Marcus worked on non-original components, Kunkle could have

7   provided asbestos-containing replacement packing.  Accordingly, the Court will **DENY** J.R.

8   Clarkson's motion for summary judgment on these claims.

9   • **Plant Products & Supply Co.**

10      Plaintiffs allege that Mr. Marcus was exposed as a bystander to asbestos-containing

11  insulation supplied by PPS.  PPS responds that Plaintiffs lack sufficient evidence to support this

12  contention.  Dkt. No. 356-1 at 18–19.

13      Mr. Marcus testified that during his service, he observed civilian contractors (such as

14  Triple A) installing half-round pipe insulation.  Marcus Depo. I, 88:4-90:3, 92:19-93:3.  He

15  recognized the insulation as supplied by Plant Product & Supply Co. because they came in boxes

16  bearing the initials "PPS."  *Id*., 99:9-16; *see also id*. VII, 726:15-23.  Mr. Marcus testified that he

17  saw these insulation PPS boxes at shipyards from 1972 until the late 1970s.  *Id*., 727:20-728:9.

18  The contractors installed new insulation by first removing the old insulation, then affixing two half

19  rounds of insulation to a pipe, and finally cutting asbestos cloth from a roll with scissors or saws to

20  wrap and seal the insulation.  *Id*. I, 92:1-93:25.  Mr. Marcus stated that cutting the asbestos

21  generated "dusty" conditions, and that he worked in "the same space" as the contractors

22  performing the insulation work.  *Id*., 93:19-22, 96:20-25, 125:17-24.  Plaintiffs point to various

23  interrogatory responses and depositions of PPS personnel to show that the company has admitted

24  to selling asbestos-containing products.  Dkt. No. 458 at 7.  For example, they point to materials

25

26  [26] Plaintiffs lodge evidentiary objections to materials filed in support of J.R. Clarkson's moving
    papers.  Dkt. No. 459 at 15-18.  Specifically, Plaintiffs object to Mark Jordan's declaration as
27  lacking personal knowledge, Chris Herfel's declaration as lacking any basis, and the Kunkle
    Catalogues and Kunkle drawings as unauthenticated hearsay.  The Court **OVERRULES** the
28  objections, but takes Plaintiffs' arguments into consideration in assessing J.R. Clarkson's
    proffered declarations and evidence.

United States District Court
Northern District of California

1   from prior lawsuits to argue that PPS supplied various asbestos-containing products to the Navy

2   for marine applications, and that they sold asbestos cloth and silicate pipe covering until 1975.  *Id*.

3   They also rely on the declaration of Howard Gordon, taken September 9, 2004 in the matter of

4   *Ocegueda v. Allied Packing & Supply, Inc.*, to argue that PPS fraudulently supplied asbestos-

5   containing insulation in PPS boxes labeled "asbestos free" until at least 1976 – three years after

6   military specifications prohibited the installation of new asbestos containing insulations, cements,

7   or cloths.  *Id*. at 8.

8        PPS contends that Plaintiffs' evidence is insufficient to establish actual exposure.[27]  Their

9   principal argument has to do with timing: they argue that because military specifications were

10   issued in 1973 that barred the use of asbestos-containing insulation, cements, or cloths, and

11   because all but one of the eight companies that manufactured asbestos-containing insulation

12   ceased producing asbestos-containing insulation for half-rounds by 1972 (and the last, Johns

13   Manville, by 1973), the new insulation that Mr. Marcus witnessed contractors install starting in

14   1972 "could have been, and most likely was, asbestos-free."  Dkt. No. 356-1 at 19.  PPS argues

15   that because Mr. Marcus did not know the manufacturer of the insulation he saw, the notion that

16   he worked with asbestos-containing Johns Manville half-round pipe insulation during 1972 was

17   "speculative at best."  *Id*.[28]

18

---

19   [27] PPS moves, without objection, for judicial notice of various materials, including (1) Plaintiffs'
     complaint, originally filed in state court, (2) PPS's articles of incorporation, filed with the
20   California Secretary of State, (3) U.S. Navy specifications and standards (specifically MIL-I-
     2781E, MIL-I-2819E, and MIL-STD-769E), and (4) a U.S. Environmental Protection Agency
21   notice titled "Asbestos; Publication of Identifying Information."  Dkt. No. 356-3.  Under Federal
     Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute
22   because it . . . can be accurately and readily determined from sources whose accuracy cannot
     reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also Khoja v. Orexigen Therapeutics*, 899
23   F.3d 988 (9th Cir. 2018).  The Court finds that judicial and governmental materials of which PPS
     requests judicial notice are not subject to reasonable dispute, and accordingly **GRANTS** PPS's
24   request that the Court consider them.  In keeping with *Khoja*, however, the Court will not assume
     the truth of the facts contained within these documents.  *See Khoja*, 899 F.3d at 999.  For example,
25   the Court will not assume that because military specifications barred the installation of new
     asbestos-containing insulation as of 1973, no asbestos-containing installation was installed after
26   that.
     [28] PPS objects to Plaintiffs' reliance on the testimony of Howard Gordon given in the *Ocegueda*
27   matter (Dkt. No. 458-10, Ex. I), which Plaintiffs rely on to argue that "PPS provided asbestos-
     containing insulation to the Navy after 1973 in PPS boxes marked 'asbestos free.'"  Dkt. No. 496
28   at 3–4.  In that case, Mr. Gordon, a civilian contractor who installed PPS thermal insulation on
     Naval ships, testified that he did not believe that the "asbestos free" claim on the PPS insulation

United States District Court
Northern District of California

However, the Court finds that the factual record contains more than speculation, and sufficiently introduces a material dispute over PPS's provision of asbestos-containing products during the relevant time period, and Mr. Marcus's exposure to them.  PPS's own expert is willing to say only that the insulation Mr. Marcus was exposed to "could have been asbestos-free," which certainly allows for Plaintiffs' version of events to be true.  Dkt. No. 356-2, Ex. H (Expert Declaration of Christopher Herfel) at 146.  That version is propped up by more than sheer speculation: even putting the half-pipe insulation aside, PPS has admitted that it supplied asbestos-containing cloths and calcium silicate pipe coverings until around 1975.  *See* Dkt. No. 458-5, Ex. D (March 10, 1995 deposition of PPS President Edward Plant), 90:18-25.  Accordingly, the Court will **DENY** PPS summary judgment on the issue of actual exposure.

- **Rockwell Automation, Inc**.

Plaintiffs allege that Mr. Marcus was exposed as a bystander to asbestos-containing electrical equipment manufactured by Allen-Bradley, including breakers, control boxes, and switchboards.[29]  Rockwell responds that Plaintiffs lack sufficient evidence to support this contention.  Dkt. No. 399-1 at 3.

Though it was not Mr. Marcus's job to perform electrical work, Mr. Marcus testified that during his time in the Navy, he was "occasionally" in "close proximity" to those working on Allen-Bradley electrical equipment.  Marcus Depo. I, 80:19-81:24, 83:21-25.  According to Mr. Marcus, the electricians would use compressed air to blow out electrical equipment – mostly

---

boxes that he handled was truthful.  Based on his understanding of the color and texture of asbestos-containing products, he testified to removing products he believed to contain asbestos from PPS boxes marked "asbestos free," and to returning some of those products to PPS on that basis.  *See* generally 458-10, Ex. I.  PPS argues that Mr. Gordon's testimony is speculative and lacking in foundation.  While the Court does not necessarily agree with this assessment (Mr. Gordon describes the physical characteristics of the half-pipes that led him to believe that asbestos was present), there is no indication that the content of Mr. Gordon's testimony can be made admissible at trial.  *See* Fed. R. Civ. P. 56(c)(2) (permitting objections where material cited to support or dispute a fact "cannot be presented in a form that would be admissible in evidence").  For one, the testimony in its current form would certainly be inadmissible, as the deposition transcript itself is hearsay not subject to any exceptions.  (Since Mr. Gordon was not a PPS employee, it does not constitute a party admission.)  Moreover, as PPS points out, Mr. Gordon has not been disclosed as a witness, so he would be unable to testify at trial to his experiences handling PPS products.  Accordingly, the Court will **SUSTAIN** the objection.

[29] Rockwell does not contest that it is the successor-in-interest to the Allen-Bradley Company.

United States District Court
Northern District of California

switchboards – before and after working on them, which created "[v]ery dirty" conditions.  *Id.*, 82:4-21; *see also* Marcus Depo. V, 534:12-16.  Sometimes, electricians would need to drill into the electrical equipment to mount components, and Mr. Marcus observed that the material into which they drilled appeared to be "ceramic."  Marcus Depo. V, 534:18-535:19.  To argue that the electrical equipment to which Mr. Marcus was exposed contained asbestos, Plaintiffs point to Rockwell's interrogatory responses and testimony in other cases.  Dkt. No. 460 at 7.

Rockwell argues that it was never approved to manufacture or supply asbestos-containing products to the Navy, such that whatever Allen-Bradley equipment Mr. Marcus encountered could not have contained asbestos.  Dkt. No. 399-1 at 3.  To support this argument, Rockwell points to the expert report of Christopher Herfel, which finds that Allen-Bradley never appeared on any Navy "qualified purchase lists" ("QPLs") as a supplier or manufacturer of asbestos-containing electrical components or equipment, and therefore was not approved to provide them.  Instead, after researching "the manufacturers and suppliers of various electrical components approved for use aboard U.S. Navy ships and submarines that were constructed and repaired in the 1940s, 1950s, 1960s, and 1970s, [Mr. Herfel] only identified Rockwell (Allen-Bradley), as an approved manufacturer of non-asbestos-containing variable rheostats intended for use by the U.S. Navy in shipboard cranes and non-asbestos containing fixed and variable resistors."  Dkt. No. 399-7 at 126.[30]

While this seems to be persuasive, it is not clear to the Court that the absence of the Allen-Bradley product at issue from the Navy's QPLs is dispositive.  Plaintiff's Naval expert, Captain Burger, states in his report that "[t]he Qualified Products List was the guideline, but not a prohibitive list of the only products that could be used aboard Navy ships."  Dkt. No. 460-12 at 32.

---

[30] Plaintiffs object to Rockwell's reliance on Christopher Herfel's expert report, arguing that the portions pertaining to Allen-Bradley products are "baseless."  Dkt. No. 460 at 12.  The key opinion at issue here is Mr. Herfel's finding that Allen-Bradley (and its subsidiary) were not "approved manufacturers of plastic molding compounds for the U.S. Navy or any of the other branches of the U.S. Military.  The only related approval in this area for Rockwell (Allen-Bradley) [he has] found is an approval to molder [sic] a non-asbestos-containing phenolic resin, known as type CFG, into usable shapes."  Dkt. No. 413-2 at 130.  Given that Mr. Herfel's conclusion appears based on his review of the Navy's QPLs, and the products that appear – or do not appear – on them, the Court finds it within the ambit of his expertise.  Accordingly, the Court will **OVERRULE** Plaintiffs' objection.

United States District Court
Northern District of California

Captain Burger opined that if a product does not appear on the QPL but meets the "form, fit and function" of those that do, substitution would be permissible. *Id.* at 34. The fact that Mr. Marcus recalled working in the vicinity of Allen-Bradley electrical equipment makes plausible that such a substitution may have occurred.

That said, Plaintiffs have not proffered sufficient evidence that even if Allen-Bradley electrical equipment made it onto the vessels on which Mr. Marcus worked, that equipment likely contained asbestos. They point to testimony elicited in other cases that purports to show that Allen-Bradley products contained asbestos, but those cases dealt with industrial rather than military applications, and with cold-molded (i.e. plastic) rather than the ceramic product that Mr. Marcus recalled electricians working with. Dkt. No. 491. While they also file a declaration by their expert witness Dr. Ellenbecker regarding the asbestos content of Allen-Bradley materials, the contents of Dr. Ellenbecker's declaration clearly go beyond the scope of his original expert report, which made no such defendant-specific findings.[31] Accordingly, the Court concludes that Plaintiffs have not introduced sufficient evidence to generate a genuine dispute as to whether the Allen-Bradley equipment that Mr. Marcus may have encountered in a bystander capacity contained asbestos. Therefore, the Court will **GRANT** Rockwell Automation, Inc. summary judgment on this ground.

- **Velan Valve Corporation**

Plaintiffs allege that Mr. Marcus was exposed to asbestos through his work on Velan valves and steam traps. Velan responds that Plaintiffs lack sufficient evidence to support this contention. Dkt. No. 404 at 20.

Mr. Marcus testified that he worked on Velan valves "too many [times] to count" during his service. Marcus Depo I, 69:14-15. He was able to identify the manufacturer of the equipment

---

[31] The Court will therefore **SUSTAIN** Rockwell's objections to the declarations of Dr. Ellenbecker (Dkt. No. 460-3, Ex. B) which it raises in the body of its reply brief. Dkt. No. 491 at 3. It will also **SUSTAIN** the objection as to the declaration of Captain Burger, to the extent that that declaration presents previously undisclosed, defendant-specific opinions. (Dkt. No. 460-10 & 460-11, Ex. I), That said, the Court will **DENY** the remainder of Rockwell's evidentiary objections, as they were not likewise lodged in the body the brief, as required by Local Rule 7-3(c), but were instead separately filed as a "Request for Evidentiary Ruling on Specified Objections." Dkt. No. 491-1.

he worked on (e.g. Velan Valve) based on the manufacturer names being "right in the casing." *Id.* I, 57:13-16. The nature of the work performed on Velan valves appears to be consistent with types of repairs Mr. Marcus testified to performing and the Court described in detail above regarding J.R. Clarkson valves. *See id.*, 60:18-66:20 (description of valve repair work). In addition to valves, Mr. Marcus also worked on Velan steam traps, which is a type of equipment that removes condensation from steam. *Id.* 69:18-23. Mr. Marcus's work on Velan steam traps involved rebuilding the traps: he would "take the cap off, replace the internal parts and replace the cap with a new gasket." *Id.*, 69:18-70:8. He used a scraper or pneumatic wire brush to remove the old gasket, which resulted in "[d]irty and dusty" conditions and then installed a new gasket according to the manufacturer's specifications. *Id.*, 70:9-71:1. Over his seventeen years working aboard vessels in the United States Navy, Mr. Marcus worked with "[t]oo many [Velan steam traps] to count." *Id.*, 71:13-19.

Velan does not argue that its products were asbestos-free. It instead argues that while it did supply valve or steam traps for installation in four of the ships that Mr. Marcus recalled by name, there is no evidence from historical records that there was Velan equipment aboard the vessels at issue during the timeframes that Mr. Marcus worked on them. Dkt. No. 404 at 7. It also argues that Mr. Marcus never worked with "brand new" Velan products. *Id.* at 7–8.

This evidence does not entitle Velan to summary judgment on the question of actual exposure. For one, Plaintiffs' testimony that he worked with countless Velan valves and steam traps on ships to which Velan acknowledges it supplied products (e.g. *USS Bryce Canyon, USS Kitty Hawk*) undermines the argument that the lack of records from a certain period should be dispositive on this point.[32] Further, there is ample evidence that, to the extent that Mr. Marcus encountered the Velan products he said he did during the course of his military service, those products incorporated asbestos-containing components. Plaintiffs point to testimony provided by

---

[32] Notably, Velan does not argue that any time gaps in its historical records should be construed as an indication that Velan had no contacts with a given vessel during that timeframe. Put a different way, Velan does not contend that the historical records it consulted are the definitive and complete record of the locations of Velan's products. Given that it does not push for that interpretation, the Court will not make it.

United States District Court
Northern District of California

1    Lawrence Piles, Velan Valve's corporate representative in this case, confirming that "any valves

2    sold by Velan prior to 1992 to the navy contained asbestos gaskets and packings" and that any

3    steam traps sold to the Navy prior to 1984 "had an asbestos gasket."  Dkt. No. 467-4, Ex. C

4    (Transcript of the Jan. 26, 2024 Deposition of Velan Valve's PMQ, Lawrence Pires) at 41:10-13,

5    45:9-24.  Plaintiffs also supply testimony from the June 30, 2011 deposition of Ewart Francois,

6    Velan's then-corporate representative, confirming that "all of the replacement gaskets supplied to

7    the U.S. Navy until January of 1992 contained asbestos."  Dkt. No. 467-5, Ex. D at 67:10-16.  On

8    this evidentiary record, a jury could reasonably conclude that Mr. Marcus was exposed to Velan

9    valves and steam traps that incorporated asbestos-containing original (even if not "brand new") or

10   replacement components.

      Accordingly, the Court will **DENY** Velan's motion for summary judgment on this ground.

12                     • **Warren Pumps, LLC**

13   Plaintiffs allege that Mr. Marcus was exposed to asbestos through his repair work on

14   insulation, gaskets, and packing in pumps associated with Warren.  Warren responds that Plaintiffs

15   lack sufficient evidence to support this contention.  Dkt. No. 398 at 12.

16   Mr. Marcus testified that he worked with Warren pumps "too many" times to count during

17   his service with the Navy.  Marcus Depo. I, 58:8-10.  Though he does not differentiate between

18   the work he performed on Warren pumps and the work he performed on other brands of pumps,

19   the Court understands his general testimony (discussed above) concerning the "minor" and

20   "major" pump repairs he performed to characterize his dealings with Warren pumps as well.

21   Like Velan, Warren does not argue that its pumps were asbestos-free.  Rather, it contends

22   that Mr. Marcus's testimony as to Warren is too generic to support the claims he makes against it.

23   Warren faults him for not "testify[ing] to any work he performed on any Warren pump, let alone

24   identify[ing] a specific asbestos-containing component from any Warren pump he would have

25   worked with or around," as well as for not identifying the vessel(s) on which he encountered

26   Warren pumps.  Dkt. No. 389-1 at 12.

27   As the Court acknowledged, it is true that at his deposition, Mr. Marcus generally

28   described his maintenance work by the *type* of product (i.e. valves, pumps) rather than by a

United States District Court
Northern District of California

product's purveyor (i.e. Warren pump, Greene Tweede packing). However, construing all inferences in Plaintiffs' favor as it must at this stage, the Court understands this to be because the testimony he provided as to a category of repairs accurately characterized his practices as to all products of that type, rather than due to, for example, a lack of recall as to a specific Defendant's products. Viewing the evidence in this light, the Court does not agree with Warren's argument that Mr. Marcus has not testified to "any work he performed on any Warren pump." From the testimony he gave about the type of work he performed on pumps like Warrens', he clearly worked in close contact – and had occasion to disturb – the gaskets and packing in those pumps. And Warren has not attempted to argue that those products did not contain asbestos, as Plaintiffs allege. Plaintiffs point to Warren's past interrogatory responses and PMK testimony to argue that Warren has conceded that it manufactured and supplied to the U.S. Navy pumps with asbestos-containing components, and that it also supplied spare and replacement asbestos-containing gaskets and packing. Dkt. No. 466 at 6–7. Warren's suggestion that only "certain" of its products contained asbestos is in tension with Captain Burger's case-specific testimony that asbestos-containing packing was "ubiquitous aboard Navy ships." Burger Depo. at 36.

Based on this, the Court concludes that there is sufficient evidence to find a genuine dispute of fact as to whether Mr. Marcus was exposed to asbestos-containing pumps associated with Warren. It must accordingly **DENY** Warren's motion for summary judgment on this issue.

### 2. *Substantial Contributing Factor*

All but a handful of Defendants moving for summary judgment argue that even if Plaintiffs have provided sufficient evidence that Mr. Marcus was exposed to asbestos attributable to their products, that exposure was de minimis such that Plaintiffs cannot establish that this exposure was a substantial factor in causing Mr. Marcus's mesothelioma.[33] *See* Dkt. Nos. 353-1 at 16, 356-1 at

---

[33] Rockwell argues only that Mr. Marcus could not possibly have been exposed to asbestos from its products; it does not make any arguments in its moving papers concerning the degree of exposure, even assuming he had been. *See* Dkt. No. 399. Similarly, Clark Reliance, Electrolux, and Spirax Sarco do not make arguments regarding causation in their moving papers, and instead focus on the immunity arguments, which the Court has rejected. *See* Dkt. No. 357-1. (The Court notes that Clark Reliance and its co-filing Defendants lodged evidentiary objections to Plaintiffs' opposition evidence in an attachment to its Reply, in violation of Local Rule 7-3(c). *See* Dkt. No. 490-1. Given that the attachment is noncompliant, the Court will **DENY** the objections made in it

1    18, 367 at 12, 382 at 6, 384-1 at 8, 388-14 at 19, 389-1 at 13, 402-1 at 18, 404-1 at 20, 409-1 at 9,

2    414-1 at 6, 415-1 at 6.  In particular, Defendants appear to argue that Mr. Marcus's testimony was

3    not specific enough, meaning that Plaintiffs' experts do not have–and cannot create–dose-specific

4    information about their products.  As a result, Defendants urge that these experts will inevitably

5    provide causation testimony that every exposure to asbestos is a substantial factor in causing

6    mesothelioma (the "every exposure" theory).  *See, e.g.*, Dkt. No. 388-14 at 22 ("Absent Buffalo-

7    specific evidence regarding the fact, amount, frequency or duration of asbestos exposure, a jury

8    could not conclude that Buffalo was a cause of Mr. Marcus' disease without implicitly reaching

9    the very 'cumulative exposure/every exposure' theory rejected by the Ninth Circuit in *McIndoe*.")

10        Defendants are correct that the Ninth Circuit in *McIndoe* rejected the "every exposure"

11    theory, reasoning that it would "permit imposition of liability on the manufacturer of any

12    [asbestos-containing] product with which a worker had the briefest of encounters on a single

13    occasion."  *See McIndoe*, 817 F.3d at 1177 (quotation omitted).  While the Court finds Plaintiffs'

14    evidence regarding substantial factor far from conclusive, it disagrees that Plaintiffs rely on an

15    "every exposure" theory of liability.  Plaintiffs have proffered (1) Mr. Marcus's testimony as to

16    the type of work he performed on various products made, sold, or supplied by each Defendant, (2)

17    evidence as to the likelihood that those products contained (or incorporated components that

18    contained) asbestos, and (3) expert testimony estimating the amount of asbestos exposure caused

19    by the various work practices Mr. Marcus testified to performing.  For instance, Mr. Marcus has

20    testified to removing and replacing gaskets countless times over his career, and Dr. Ellenbecker

21    cites to studies showing that "short term [asbestos] exposures during dry removal of gaskets varied

22    between 0.11 and 0.33 f/cc when surface cleaning was done with a scraper and/or with a wire

23    brush," and 6.8 f/cm3 when performed with a power wire brush.  Dkt. No. 459-6 at 28.  Dr.

24    Finkelstein further opines that "[t]he performance of one gasket replacement job thus produces an

25    exposure which is 95% of the annual ambient exposure to asbestos fibers. Performing 70 such jobs

26    would thus match the ambient lifetime exposure of a 70 year old man[.]"  Dkt. No. 446-2 at 57.

27

28    ────────────────
     to the Marcus Declaration, since that objection was not noted within the body of the brief.)

United States District Court
Northern District of California

Construing all inferences in Plaintiffs' favor, a jury synthesizing Mr. Marcus's testimony as to the work he performed, Plaintiffs' evidence about that work being performed on or near asbestos-containing products, and Plaintiffs' experts' qualitative and quantitative opinions as to the amount of asbestos exposure that type of work caused, could reasonably conclude, for instance, that Mr. Marcus's work on "too many" Buffalo pumps to count over the course of his 17-year career substantially contributed to his development of mesothelioma.  While Defendants argue that Plaintiffs' experts' testimony is insufficient since it is not specific to their products, they have not shown why the experts' calculations as to asbestos exposure from gasket replacement would vary whether the pump at issue is, for example, a Buffalo pump or Warren pump.

That said, to the extent that Plaintiffs' experts attempt to offer "every exposure" testimony at trial, the Court will not permit it.  And as to their other opinions, Defendants obviously can challenge Plaintiffs' experts with their own experts and on cross-examination.  After all, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Since Plaintiffs' evidence fits squarely into this "shaky but admissible" category, the Court is of the view that testing Plaintiffs' causation evidence as trial is the appropriate course.

\* \* \*

Although the evidence that Plaintiffs proffered is not especially strong, when viewed in the light most favorable to them, the Court finds that it is sufficient to raise at least one genuine dispute of material fact regarding: (1) whether Mr. Marcus was exposed to asbestos-containing products made, sold, or supplied by each Defendant; and (2) whether such exposure was a substantial factor in causing his disease.

## III.    CONCLUSION

The Court **GRANTS IN PART and DENIES IN PART** Plaintiffs' motion to exclude Christopher Herfel (Dkt. No. 413) and **DENIES** Defendants' motions to exclude Plaintiffs' experts (Dkt. Nos. 360, 362, and 369).  It further **GRANTS** Metalclad Insulation LLC's motion for partial summary judgment (Dkt. No. 391), **GRANTS IN PART and DENIES IN PART** the

United States District Court
Northern District of California

United States District Court
Northern District of California

motions for summary judgment filed by Cleaver Brooks, Inc., Plant Products & Supply Co., BW/IP, Inc., Foster Wheeler Energy Corporation, Greene, Tweede & Co., Air & Liquid Systems Corporation, Rockwell Automation, Inc., the J.R. Clarkson Company LLC, Velan Valve Corporation, Gardner Denver, Inc., Eaton Corporation, BWDAC, Inc. and Metalclad Insulation LLC (Dkt. Nos. 353, 356, 367, 382, 384, 388, 399, 402, 404, 409, 414, and 415), and **DENIES** the motions for summary judgment brought by Clark Reliance Corporation, Electrolux Home Products, Inc., Spirax Sarco, Inc., and Warren Pumps, LLC (Dkt. Nos. 357, 389).  The Court further **TERMINATES** the improperly lodged evidentiary objections at Dkt. Nos. 502 and 504.

By July 2, 2024, all Defendants who intend to call Mr. Christopher Herfel as an expert at trial must jointly submit a filing no more than four (4) pages in length that identifies the discrete opinions that Mr. Herfel plans to offer, consistent with the holding articulated in this order.

Finally, the Court **SETS** a telephonic case management conference on July 16, 2024, at 2:00 p.m., with the case management statement due by July 9, 2024. All counsel shall use the following dial-in information to access the call:

Dial-In:  888-808-6929

Passcode:  6064255

All attorneys and pro se litigants appearing for a telephonic case management conference are required to dial in at least 15 minutes before the hearing to check in with the courtroom deputy.  For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

**IT IS SO ORDERED.**

Dated:    6/24/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge